IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SANDRA JEAN KELLY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:14-cv-00557 |
| v. ) | |
| ) | Judge Trauger |
| NANCY BERRYHILL,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is Plaintiff Sandra Jean Kelly's Motion for Judgment on the Administrative Record ("Motion") (Docket No. 12), filed with a Memorandum in Support (Docket No. 12-1). Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Plaintiff's Motion (Docket No. 13), to which Plaintiff replied (Docket No. 14). On January 13, 2017, this case was referred to a Magistrate Judge. (Docket No. 18.) Upon consideration of the parties' filings and the transcript of the administrative record (Docket No. 10),[2] and for the reasons given herein, the Plaintiff's Motion (Docket No. 12) will be granted.

### I. Introduction

Kelly filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act and an application for supplemental security income ("SSI") under Title XVI on February 4, 2010, both alleging a disability onset of June 26, 2009. (Tr. 9.) Kelly's claim

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.
[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

was denied at the initial and reconsideration stages of state agency review. Kelly subsequently requested *de novo* review of her case by an Administrative Law Judge ("ALJ"). The ALJ heard the case on July 23, 2012, when Kelly appeared with counsel and gave testimony. (Tr. 36–52.) Testimony was also received from a vocational expert ("VE"). At the conclusion of the hearing, the matter was taken under advisement until August 24, 2012, when the ALJ issued a written decision finding Kelly not disabled. (Tr. 6–21.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through at least the date of this decision.

2. The claimant has not engaged in substantial gainful activity since June 26, 2009, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease with radiculopathy, obesity, major depressive disorder, and post traumatic [sic] stress disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, … the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except occasional postural activities. She can understand simple and detailed instructions, can concentrate and persist for two hours at a time, can interact appropriately with others, and can adapt to infrequent changes.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant is a younger individual (20 C.F.R. 404.1563 and 416.963).

8. The claimant likely has a limited education (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the regional and national

economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 26, 2009, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

12. The claimant's subjective complaints, including pain, have been evaluated as required under regulations and rulings.

(Tr. 11–12, 14–16.)

On December 24, 2013, the Appeals Council denied Kelly's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).

## II. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

> The claimant was injured at work in December 2008, but continued to work while undergoing conservative treatment until June 2009. Although surgery was originally to be performed in February 2009, insurance problems prevented it until the later date, when she underwent a laminectomy and microdiskectomy [sic] at L4-5 for herniated disc, spondylosis, and radiculopathy. Her treating surgeon, Dr. Boyce, noted by September 2009 that she no longer limped, she did not appear to be in any distress, and had no tenderness to palpation, with nearly normal range of motion. She was to continue physical therapy, increase her dosage of Lyrica, and take Ultram. By November 2009, she had recovered nicely from her radicular complaints. Pain was a 2 on a scale of 10. She had good range of motion, negative straight leg raising testing, and strength and sensation were intact. Dr. Boyce found that the claimant could work as tolerated. She was seen for trochanteric bursitis that month and in January 2010, for which she was given an injection. She was to return as needed. Exhibits 2F, 3F, 6F, 8F, and 14F. There is no evidence that she has returned to see Dr. Boyce.
>
> She was then seen at Matthew Walter Comprehensive Health Center from August 2010 through November 2011, during which time there were few complaints of back or leg pain. In fact, the claimant affirmatively stated that her pain was 0 on a scale of 10 in

3

August and September 2010, May, August, and November 2011. She was seen for vaginitis, rashes, and beginning in May 2011, depression. GAF was no lower than 56. Weight varied from 217 pounds in November 2011 to 225 pounds in August 2010. X-rays of the left hip were normal in July 2011. She reported that she had a GED on several occasions. Exhibit 20F.

She was not seen for pain management until September 2011, and then received a series of epidural steroid and sacroiliac joint injections, which apparently provided at least temporary relief. Pain was reported as 0 to 3 on a scale of 10 after each injection. She had abnormal urine drug tests in January 2012, when she tested positive for Methadone, although she claimed never to have taken the medication, and in February 2012, when she tested negative for a prescribed medication, Ultram. She reported that she took that medication only when needed. She received trochanteric bursa injections for hip pain again in March and April 2012. She was seen for a Workers Compensation neurosurgical evaluation in April 2012 by Dr. Elalayi, who recommended no further surgery. He reviewed an October 2011 MRI which he interpreted as showing no evidence of a herniated disk or impingement. He recommended pain management evaluation. Exhibits 16F, 17F, and 19F.

Prior to her Workers Compensation settlement, she underwent an independent medical evaluation by Dr. Gaw, in March 2010, less than a year out from her surgery. She reported feeling 15-20% better than before surgery (but see her report of pain at 0 on a scale of 10 in August 2010, [E]xhibit 20F). On physical examination, she weighed 220 pounds at a height of 66 inches. She was in no obvious distress, although she walked fairly slowly and hesitantly. She stood during the examination, because she said she could not sit. She reported that she had a GED. Spine had normal curvature. She had functional range of motion. She was able to do straight leg raising to 80 degrees. There was no weakness or atrophy of muscle groups of the lower extremities. She had normal sensation. Coordination was good. Reflexes were equal in lower extremities. There was no edema. She had good movement of the hips. Dr. Gaw concluded that her work injury had aggravated her pre-existing degenerative disk [sic] disease. He found an 11% permanent partial impairment rating of the whole person. Exhibit 21F.

Because she complained of depression but had not undergone mental health treatment, she was referred for consultative

psychological examination, conducted by examiner Stair in April 2010. She drove herself to the evaluation. She was a good historian, and was cooperative. She complained of sadness, anxiety, and worrying a lot. The only mental health treatment she had received was six weeks of counseling in 1995. She reported she had been sexually abused as a child. She preferred to avoid other people currently. She had been married at one time, and lived with her husband and daughter. In contrast to other statements, she reported that she had never completed her GED. Her grades in school were low; she had difficulty focusing because of the problems at home. On mental status evaluation, abstracting ability was average. She was oriented. She did fairly well on serial seven testing. She could recall all three items after five minutes. Memory was intact. She had an average degree of higher executive functioning. Affect was dysphoric. Attention was fair to good. Speech was within normal limits. Eye contact was good. She reported a variable appetite, although she had gained 45 pounds in the last three to four years. She complained of difficulty sleeping. She showed moderate situational anxiety, with occasional panic features (but not enough to meet the criteria for a panic disorder). She was moderately depressed. Intellectual functioning appeared to be in average range. Activities of daily living included getting her husband off to work, cleaning up around the house with the help of her daughter, talking on the telephone, making quick trips to the store, doing water aerobics to help her back recover, and occasional cooking. She saw her family weekly. Diagnostic impression was adjustment disorder with mixed anxiety and depressed mood, with a GAF of 55. No more than mild limits were found in any area of functioning. Exhibit 10F.

As noted above, she was treated for depression at the Matthew Walker Center for several months beginning in May 2011, over a year after the consultative evaluation. She began treatment at the Mental Health Cooperative in June 2011. She was noted to have stage I depression. She tested positive for benzodiazepines for months although denied usage. One of the diagnoses to be ruled out was benzodiazepine abuse. She was seen for medication management by Nurse Practitioner Spitz; there is no evidence that she ever saw a medical doctor. Symptoms included suicidal ideation, irritability, anger, anxiety, and difficulty sleeping. She told her case manager in July 2011 that her house was being foreclosed on. Major problems appeared to involve break-up of her marriage and difficulty with her teenage daughter. She was seen regularly for medication management, although not so

regularly for individual therapy and case management; there are several notations that she cancelled or failed to keep such appointments. With adjustment in her medication, her symptoms improved, with decreased irritability, better sleep, lack of suicidal ideation, and better concentration and attention. In March 2012, she reported that she wanted to go back to work. Diagnoses included major depressive disorder and post traumatic [sic] stress disorder. Exhibit 18F. Nurse Practitioner Spitz completed an assessment in July 2011, only one month after she started treating the claimant in June 2011. She found mild limits in understanding, remembering, and carrying out instructions, with moderate limits on complex instructions, moderate limits in making judgments on complex work related decision, social interaction, and mild limits in adaptation. Exhibit 15F.

(Tr. 12–14.)

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc.*

*Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to

7

Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony.

8

*Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Errors

Kelly argues that the ALJ erred by failing to: (1) consider or evaluate her mental impairments and resulting functional limitations; (2) include limitations in her RFC finding to account for Kelly's mental impairments and resulting limitations; and (3) properly evaluate or assign weight to the medical opinions of record and by failing to resolve inconsistencies between those opinions and her RFC finding. (Docket 12-1, pp. 10–16.) Because the court finds that the ALJ committed reversible error with respect to Kelly's final argument, for the reasons discussed below, the court also finds it unnecessary to address Kelly's first two claims.

SSR 96-6p requires an ALJ to consider opinions of state agency medical experts when considering disability claims. Such medical opinions are not binding on the ALJ, but the ALJ may not ignore them and must explain the weight given to the opinions in their decision. 20 C.F.R. § 404.1527(e)(2)(ii). Such explanation must be "meaningful." *Ott v. Comm'r of Soc. Sec.*, No. 1:08–CV–00399, 2009 WL 3199064, at *3 (S.D. Ohio Sept. 29, 2009). In fact, when weighing opinions of state agency consultants, Social Security regulations require the ALJ to apply the same level of scrutiny as afforded to treating source opinions. *Gayheart*, 710 F.3d at 379. "A more rigorous scrutiny of the treating-source opinion than the nontreating and

nonexamining opinions is precisely the inverse of the analysis that the regulation[s] require[ ]."

*Id.*

Here, in analyzing the opinions of the state agency doctors, the ALJ stated only that

> [t]he light residual functional capacity is found, looking at medical evidence in the light most favorable to claimant. The state agency doctors found that she could do medium work. No treating physician assessed her ability to work. Dr. Gaw, not a treating source, found only an 11% permanent partial impairment rating of the whole person, less than one year after her surgery. She told her therapist in 2012 that she wanted to go back to work. The state agency medical consultants and psychological examiner Stair did not find any severe psychological limitations. However, since those sources reviewed the record and examined the claimant, she has obtained consistent mental health treatment. Her symptoms have improved with treatment, which she admitted at the hearing. The psychological limitations listed above limit the claimant to essentially unskilled work.

(Tr. 14–15.) This is quite simply insufficient.

Since there was no treating source's opinion, the ALJ was required to provide a meaningful explanation in the decision of the weight given to the opinions of the state agency doctors. The ALJ failed to state the weight given to *any* of the medical opinions of record, failed to consider all of the state agency doctors' opinions, and also failed to mention or provide an explanation concerning any of the 20 C.F.R. § 404.1527(c) factors. The ALJ's conclusory assessment thus fails to satisfy her obligation to provide a meaningful analysis of the weight accorded all medical source opinions of record. *See Evans v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 566, 576 (S.D. Ohio 2015) (citation omitted). The Commissioner argues that the ALJ's evaluation was proper and provides an explanation of the summaries of the various medical opinions of record. (Doc. No. 13, pp. 9–12.) However, no such explanation is provided by the ALJ, and the court "may not accept appellate counsel's post hoc rationalizations for agency

action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *6 (6th Cir. Sept. 16, 1993) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 (1983)).  "Courts are not at liberty to speculate on the basis of an administrative agency's order. … The court is not free to accept 'appellate counsel's post hoc rationalization for agency action in lieu of reasons and findings enunciated by the Board.'"  *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991).  Thus, the Commissioner's post hoc rationalizations are not an acceptable substitute for the ALJ's lack of rationale concerning her treatment of the medical opinions of the state agency doctors.

The court recognizes that the record may contain evidence that otherwise supports the ALJ's decision.  Nevertheless, the ALJ is required to follow the procedures set forth in the SSA regulations so that the court may ascertain whether the ALJ's decision is, in fact, supported by substantial evidence.  Accordingly, the court concludes that remand for further proceedings is necessary so that the ALJ can reasonably and meaningfully weigh all opinion evidence and determine Kelly's disability status anew.  Because of this conclusion, the court finds it is unnecessary to address Kelly's other arguments.

## IV. Conclusion

For the reasons stated above, Plaintiff's Motion for Judgment on the Record (Docket No. 12) will be granted and an appropriate Order will be filed herewith.

ENTER this 31st day of July 2017.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE